RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0294p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

IN RE: FIRSTENERGY SOLUTIONS CORP., et al.

*Debtors.*

———————————————————————

FEDERAL ENERGY REGULATORY COMMISSION
(18-3787); OHIO VALLEY ELECTRIC CORPORATION
(18-3788 & 18-4095); DUKE ENERGY OHIO, INC.
(18-4097); OFFICE OF THE OHIO CONSUMERS'
COUNSEL (18-4107); MARYLAND SOLAR HOLDINGS,
INC. (18-4110),

                                *Appellants,*

    *v.*

FIRSTENERGY SOLUTIONS CORP.; FIRSTENERGY
GENERATION, LLC; OFFICIAL COMMITTEE OF
UNSECURED CREDITORS; AD HOC NOTEHOLDERS
GROUP; PASS-THROUGH CERTIFICATEHOLDERS,

                                   *Appellees.*

Nos. 18-3787/3788/4095/4097/4107/4110

———————————

Appeal from the United States Bankruptcy Court
for the Northern District of Ohio at Akron.
Nos. 5:18-bk-50757; 5:18-ap-05021—Alan M. Koschik, Judge.

Argued: June 26, 2019

Decided and Filed: December 12, 2019

Before: BATCHELDER, GRIFFIN, and DONALD, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Joseph F. Busa, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Appellant Federal Energy Regulatory Commission. Erin E. Murphy,
KIRKLAND & ELLIS LLP, Washington, D.C., for Appellant Ohio Valley Electric Corporation.
David A. Beck, CARPENTER LIPPS & LELAND LLP, Columbus, Ohio, for Appellant Office

of the Ohio Consumers' Counsel. Gary M. Kaplan, FARELLA BRAUN + MARTEL LLP, San Francisco, California, for Appellant Maryland Solar Holdings, Inc. Pratik A. Shah, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Appellees. **ON BRIEF:** Joseph F. Busa, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant Federal Energy Regulatory Commission. Erin E. Murphy, Subash S. Iyer, Kasdin M. Mitchell, KIRKLAND & ELLIS LLP, Washington, D.C., Mark McKane, P.C., KIRKLAND & ELLIS LLP, San Francisco, California, for Appellant Ohio Valley Electric Corporation. Matthew A. Fitzgerald, MCGUIREWOODS LLP, Richmond, Virginia, John H. Thompson, MCGUIREWOODS LLP, Washington, D.C., Aaron G. McCollough, MCGUIREWOODS LLP, Chicago, Illinois, for Appellant Duke Energy Ohio, Inc. David A. Beck, Michael N. Beekhuizen, CARPENTER LIPPS & LELAND LLP, Columbus, Ohio, Candice Kline CARPENTER LIPPS & LELAND LLP, Chicago, Illinois, for Appellant Office of the Ohio Consumers' Counsel. Pratik A. Shah, Z.W. Julius Chen, Lide E. Paterno, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., John C. Fairweather, Lisa S. DelGrosso, BROUSE MCDOWELL, LPA, Akron, Ohio, David M. Zensky, Brian T. Carney, AKIN GUMP STRAUSS HAUER & FELD LLP, New York, New York, Gary Svirsky, Janine Panchok-Berry, O'MELVENY & MYERS LLP, New York, New York, Michael J. Kaczka, MCDONALD HOPKINS LLC, Cleveland, Ohio, Andrew Parlen, LATHAM & WATKINS LLP, New York, New York, Amy Caton, Paul Bradley O'Neill, Joseph A. Shifer, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York, Aaron Renenger, Erin Elizabeth Dexter, MILBANK LLP, Washington, D.C., Alexander B. Lees, MILBANK LLP, New York, New York, Rocco I. Debitetto, Christopher B. Wick, HAHN LOESER & PARKS LLP, Cleveland, Ohio, for Appellees. Howard A. Learner, ENVIRONMENTAL LAW & POLICY CENTER, Chicago, Illinois, Donald B. Verrilli Jr., MUNGER, TOLLES & OLSON LLP, Washington, D.C., for Amici Curiae.

BATCHELDER, J., delivered the opinion of the court in which DONALD, J., joined, and GRIFFIN, J., joined in part. GRIFFIN, J. (pp. 29–41), delivered a separate opinion concurring in part and dissenting in part.

———————

**OPINION**

———————

ALICE M. BATCHELDER, Circuit Judge. FirstEnergy Solutions Corp. (FES) and a subsidiary filed Chapter 11 bankruptcy and initiated an adversary proceeding to enjoin the Federal Energy Regulatory Commission (FERC) from interfering with its plan to reject certain electricity-purchase contracts that FERC had previously approved under the authority of the Federal Power Act (FPA), 16 U.S.C. § 791a, *et seq*., and/or the Public Utilities Regulatory Policies Act (PURPA), 16 U.S.C. § 2601, *et seq*. FERC opposed the action. Several other

parties intervened to oppose the action as well, including three counterparties to those contracts (Ohio Valley Electric Corp. (OVEC), Duke Energy, and Maryland Solar Holdings Inc.) and the Ohio Consumers' Counsel.

The bankruptcy court decided that it had exclusive and unlimited jurisdiction, while FERC had no jurisdiction, and enjoined FERC from taking any action relating to the contracts. The bankruptcy court then applied the ordinary business-judgment rule and found that the contracts were financially burdensome to FES, so it permitted FES to reject them, rendering the contracts "breached" and the counterparties unsecured creditors to the bankruptcy estate. Each of the opponents appealed and sought leave to appeal directly to the Sixth Circuit, which we granted. We consolidated the appeals, which arise from both the injunction and contract-rejection orders.

The questions here concern the status of these federal-agency-endorsed contracts in bankruptcy proceedings, the nature and extent of jurisdiction as between the bankruptcy court and the federal agency (FERC), and the proper standard for deciding a Chapter 11 debtor's request to reject such contracts. We conclude that the bankruptcy court has jurisdiction to decide whether FES may reject the contracts, but that its injunction of FERC in this case was overly broad (beyond its jurisdiction), and its standard for deciding rejection was too limited. Therefore, we AFFIRM in part, REVERSE in part, and REMAND to the bankruptcy court for further consideration.

## I.

FES distributes electricity, buying it from its fossil-fuel and nuclear electricity-generating subsidiaries and selling it to retail clients, corporate affiliates, and in the PJM[1] spot market. FES has 1.3 million customers in six states and a total capacity of 10,000 megawatts (MW).

Since at least 2003, regulations have required FES to buy a certain amount of "renewable energy credits" (RECs). But back in 2003, and until at least 2011, three things were very

---

[1]PJM is the "Pennsylvania New Jersey Maryland Interconnection LLC." It coordinates access to wholesale electricity in 13 states and the District of Columbia (65 million people), by overseeing the transmission systems of competing electricity suppliers and users via exchange markets. Its total capacity is about 200,000 MW.

different than they are now: (1) FES's retail electricity sales were much greater, so its REC requirements were correspondingly greater; (2) the supply of RECs was more limited, so FES was compelled to enter long-term contracts to get enough RECs at an agreeable price; and (3) electricity prices were much higher and were expected to remain high. To ensure a long-term supply of RECs, FES signed eight power purchase agreements (PPAs), totaling 500 MW of gross capacity (though an effective capacity of only 75 MW because renewable energy capacity is more intermittent[2]). Under these PPAs, FES purchased the RECs (and the power, capacity, and ancillary services) from wind- and solar-based generating facilities, such as Duke and Maryland Solar. Also, FES signed three of the PPAs (93 MW of energy) to satisfy a subsidiary's consent decree with the United States Environmental Protection Agency (USEPA).[3]

In recent years, however, the government has relaxed the REC requirements; there is an abundance of RECs available for purchase; and energy and capacity prices are much lower. These market changes rendered the PPAs financially burdensome to FES, which is in the process of selling (or has sold) its entire retail business and has no commercial or regulatory need for the RECs from these PPAs—it estimates that it is losing $46 million per year on these PPAs.[4]

Several years ago, FES also entered into a multi-party intercompany power purchase agreement (referred to in this case as "ICPA," for "inter-company power agreement") with 12 other companies, including Duke, in which each participant agreed to a proportionate stake in the electricity production from and management, maintenance, and ultimate decommissioning of OVEC's fossil-fuel-based electricity generating plants. As with the PPAs, FES no longer needs the electricity from this contract and these prices are very high. FES's stake is 4.85%, under

---

[2]At 75 MW, these PPAs account for 0.75 % of FES's overall capacity and less than 0.04% of the total market (i.e., PJM's total resources of 200,000 MW). Even the gross of 500 MW would be only 5% and 0.25%, respectively.

[3]Nothing in the record suggests that USEPA has intervened or acted to oppose the rejection of these contracts.

[4]FES estimated this at $765 million over the remaining term, or $475 million as net present value.

which FES expects to lose approximately $268 million over the remaining term (i.e., until 2040).[5]

In March 2018, FES filed for bankruptcy under Chapter 11 and immediately (the next day) filed an adversary complaint against FERC, seeking (1) a declaratory judgment that the bankruptcy court's jurisdiction is superior to FERC's and (2) injunctions prohibiting FERC from interfering with its intended rejection of the ICPA and the PPAs (i.e., forbidding FERC from ordering it to continue to perform under those contracts) and prohibiting FERC from even conducting any proceedings concerning those contracts (i.e., preventing FERC's regulatory mandated hearings about them). FES argued that this was just a piece of its overall bankruptcy restructuring[6] and it was necessary for it to reject these contracts to implement a successful reorganization; but, if FERC prevented (or even delayed) that rejection, then FES could not overcome the ongoing expense of the contracts.

FES emphasized that its problem with these contracts was not just the prices of the electricity and RECs. Rather, FES has no need (or use) for the electricity, the RECs, or the standby capacity from these contracts. FES's retail electricity sales dictate its regulation-based need for RECs, but it is now selling less than half of the retail electricity it sold in 2013 and is trying to leave (or has left) the retail business entirely. Even if it were not leaving this business, FES has enough surplus RECs in inventory to cover its retail business for years. FES explained that none of FES's customers—or any consumer—would lose electricity without the ICPA or the PPAs. In 2017, the total electricity bought under these contracts was just 0.2% of the PJM market (i.e., 1.9 of 767 terawatt hours, TWh). And FES insisted that the contract counterparties could easily sell their electricity to other wholesale purchasers or into the PJM regional wholesale electric markets.

Four interested parties (OVEC, Duke, Maryland Solar, and OCC) intervened and joined FERC in arguing against the requested declaratory judgment (i.e., against the bankruptcy court's having exclusive jurisdiction) and against the injunctions (i.e., against the claim that the

---

[5]That is reasonably estimated at about $134 million as net present value.

[6]FES has already rejected certain uranium contracts, coal and rail contracts, and lease agreements.

automatic stay provision or the bankruptcy court's power to protect its orders justified the injunction). They argued that the FPA gave FERC exclusive jurisdiction over energy contracts; that once a contract has been filed with FERC, the "filed-rate doctrine" holds that FERC and only FERC can modify or abrogate that contract; and that the "*Mobile-Sierra* doctrine" holds that FERC may only do so if it finds that the contract is not just and reasonable, in that it seriously harms the public interest. Therefore, they argued, FERC has exclusive jurisdiction to determine whether the contracts could be abrogated; or, alternatively, concurrent jurisdiction to determine the public-interest aspect of FES's intended rejection. They argued that Chapter 11's automatic stay provision did not apply because FERC's authority over these filed contracts fell within the "regulatory powers" exception, nor could the bankruptcy court overcome FERC's congressionally granted authority to regulate such filed contracts and the parties to these contracts. Basically, if these appellants had their way, FERC would hold a hearing to determine whether rejection of the contracts would harm the public interest and, if so, FERC would either—under an exclusive-jurisdiction theory—forbid the rejection (i.e., compel FES to continue to perform the contracts), or—under a concurrent-jurisdiction theory—provide the bankruptcy court with a statutory-based reason to deny the rejection (i.e., compel FES to assume the contracts in bankruptcy). Of course, if FERC were to determine that rejecting the contracts did *not* seriously harm the public interest, then, presumably, it would cede the decision to the bankruptcy court.[7] FES says that, because time is money, it can neither wait for FERC to conduct such a hearing (and issue a decision) nor risk a FERC order disallowing rejection (and then wait to conclude an appeal of such a FERC decision).

The bankruptcy court acted immediately, issuing a temporary restraining order while it pondered the motions. At a hearing on May 11, 2018, the court recognized that OVEC had already (prior to FES's bankruptcy filing[8]) moved FERC to assert its jurisdiction over the contracts (as superior to the bankruptcy court's jurisdiction), confirm the contracts, and order

---

[7]FES contends that, "under the exacting *Mobile-Sierra* standard," it is "inevitable" that FERC would deny rejection, so the only possible outcome of a FERC hearing would be an order demanding that FES continue performance. *See* FES Appellee Br. at 3. This contention appears overblown and, in this case, likely wrong.

[8]OVEC filed its action with FERC on March 26, 2018. FES filed its bankruptcy petition on March 31, 2018.

FES to continue performing. The bankruptcy court found that, while OVEC's request "may incidentally serve the public interest," it would more substantially adjudicate private rights of the counterparties so as to "result in a pecuniary advantage to [them] vis-à-vis other creditors . . . contrary to the Bankruptcy Code's priorities," and that was "the obvious and dominant purpose of the FERC proceeding."[9] The court concluded that the automatic stay, 11 U.S.C. § 362(a), stopped "the FERC proceeding an[d] the commencement of any similar proceeding before FERC, notwithstanding the [regulatory] powers exception to the automatic stay in [] § 362(b)(4)," and that § 105(a) alternatively authorized it to impose the same injunction. The bankruptcy court enjoined FERC from:

(1) "initiating or continuing any proceeding,"

(2) "issuing any order, to require or coerce [FES] to continue performing [the contracts] or limiting [FES] to seeking abrogation . . . under the [FPA]," or

(3) "interfer[ing] with th[e] [bankruptcy] [c]ourt's exclusive jurisdiction."

Given the breadth of this injunction, FERC did nothing further.

On May 18, 2018, the bankruptcy court issued a lengthy opinion in support of that order. *In re FirstEnergy*, No. 18-50757, 2018 WL 2315916 (Bankr. N.D. Ohio. May 18, 2018). The court cited *Chao v. Hospital Staffing Services, Inc.*, 270 F.3d 374 (6th Cir. 2001), as "controlling authority governing the interpretation of the . . . regulatory power exception to the automatic stay in the Sixth Circuit," *FirstEnergy*, 2018 WL 2315916, at *8, and applied its own construction of *Chao* to hold that the exception does not apply "to the FERC Proceeding or any proceeding similar to [it]," *id.* at *6, based on analysis under the "public policy test," *id.* at *9-11. The court was emphatic in enjoining FERC from doing *anything*—even holding any hearing—by claiming that it was saving FERC and the parties from "a fool's errand because any order [FERC] might issue" from such a proceeding would necessarily be "void ab initio," *id.* at *11. The court also gave itself "the power to enjoin FERC under Section 105 even if the automatic stay did not

---

[9]While these doctrines and the considered application of them will be presented and discussed fully in this opinion, it bears quick mention at this point that FERC's standard for these decisions under the *Mobile-Sierra* doctrine is based solely and entirely on the public interest, without any regard for the effect on the private parties.

apply, . . . to avoid the cost and delay of unnecessary proceedings that would ultimately be held void." *Id.*

The court relied on *In re Mirant Corporation*, 378 F.3d 511, 523 (5th Cir. 2004) (announcing that "a bankruptcy court can clearly grant injunctive relief to prohibit FERC from negating [a debtor's] rejection [of a filed contract] by requiring continued performance at the pre-rejection filed rate"), to support the § 105(a) authority for its injunction. *Id.* at \*11-13. The court established that *Mirant* is the only circuit court case that is even close to being on point and emphasized that "in the fourteen years since *Mirant* was decided by the Fifth Circuit, Congress has not provided any exception to [a bankruptcy court's] rejection of regulated power contracts pursuant to Section 365(a)." *Id.* at \*14. But the court did not adopt all of *Mirant*—it took the parts that gave it more power (i.e., authority to enjoin FERC) and ignored or rejected the parts that did not (i.e., limits on its ability to enjoin FERC, the careful tailoring of that injunction, the higher public-interest standard for rejecting contracts, etc.). The court also expressly rejected the only federal court case that disagreed with *Mirant*, namely, *In re Calpine Corp*., 337 B.R. 27 (S.D.N.Y. 2006) (holding that the rejection of a filed contract was a collateral attack on the filed rate and thus within FERC's exclusive jurisdiction, not the jurisdiction of the bankruptcy court).

Ultimately, the bankruptcy court decided that the injunction was necessary here because:

> If FERC were not stayed or enjoined from issuing such an order [to perform the contracts] and [if it] did issue such an order, and [if] the result actually w[ere] that this [c]ourt lost effective jurisdiction over [rejection of these contracts] . . . , there would be no practical way to repair the damage inflicted by the mere fact of making the debtor litigate post-petition performance obligations in multiple forums, defeating a central goal of the Bankruptcy Code of providing an efficient and centralized forum for the reorganization of debtor-creditor relations.
>
> . . .
>
> FERC will not be harmed by . . . [an] injunction, because this [c]ourt is asserting no authority to modify a filed rate in derogation of FERC's exclusive jurisdiction over such matters. Rather, the [] injunction will prevent a lengthy proceeding that is likely to be *void ab initio*, and instead permit [FES] and [] creditors to focus on the bankruptcy case that will vindicate the [] contracts at issue and their filed rate by allowing damage claims pursuant to those contracts and rates.
>
> With respect to [the contracts'] counterparties, the prospect that [FES] might reject executory contracts that the Bankruptcy Code [presumably] allows them to

> reject cannot be a cognizable 'substantial harm,' particularly when the Rejection Motions are not yet being heard on their merits. Moreover, those parties are entitled to due process in this [c]ourt and in [FES's] bankruptcy cases. The[] [counterparties] will be entitled to allowed claims based on applicable non-bankruptcy law for breach of contract damages resulting from the rejection of their contracts. The financial disappointment derived from the fact that their claims may not be paid in full . . . will be fairly shared with all other unsecured creditors[.]

*FirstEnergy*, 2018 WL 2315916 at *19. That is, according to the bankruptcy court, it had to seize complete authority and enjoin FERC from any actions whatsoever, or else FERC and the Federal Power Act might interfere with bankruptcy reorganization, which could cause the debtor (FES) some financial hardship; and, it does not matter that FERC has a congressional mandate, that OCC is a public-interest group not a counterparty, or that the counterparties sought enforcement of these as filed rates regardless of any contract status. The bankruptcy court presupposed three contested things: that it has exclusive jurisdiction, that these are ordinary contracts (not de jure regulations via the FPA and the filed-rate doctrine), and that the public interest—which is otherwise paramount in the world of electricity contracts—is irrelevant or insignificant in a bankruptcy reorganization. The court also ignored the fact that its depiction of the foreseeable harm depends on a series of speculations, which could easily be flipped to apply the other way (i.e., that granting FERC exclusive jurisdiction and deciding the claims there would be equally final and effective, but merely flip the appellants).[10]

Having taken exclusive jurisdiction—and enjoined FERC from even so much as holding a hearing, collecting information, or opining on the public interest—the bankruptcy court turned its attention to the dispute over the proper legal standard for deciding whether FES could reject the contracts. FES argued for application of the ordinary business-judgment rule, which allows a

---

[10]For example, simply flipping the opening paragraph from the quoted passage would result in:

> If [the bankruptcy court] were not enjoined from [rejecting the contracts], and if it issued such an order, and if the result actually were that [FERC] lost effective jurisdiction over these contracts, there would be no practical way to repair the damage inflicted by the mere fact of [allowing] the debtor [to reject contracts without regard to the harm inflicted on the area-wide energy market, local governments and utilities, and the general public], defeating a central goal of the [FPA] of providing an efficient and centralized forum for the [governance of filed energy contracts].

That would make FES the appellant here, and the same lengthy appeal would ensue—and that appeal could, theoretically, conclude in a finding that the bankruptcy order was void *ab initio* and a "fool's errand."

debtor to reject any executory contract that is "financially burdensome" to the debtor's estate such that it would inhibit the debtor's Chapter 11 reorganization.  The counterparties (FERC did not participate at this stage on this issue) argued for a "heightened standard," such as the one the Supreme Court first crafted in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523-26 (1984), which the Fifth Circuit, in *Mirant*, 378 F.3d at 525, adjusted to fit to energy contracts by requiring that, in addition to the business-judgment rule, the bankruptcy court would further "carefully scrutinize the impact of rejection upon the public interest" and authorize the rejection *only if* the debtor can show "that, after careful scrutiny, the equities balance in favor of rejecting that power contract."

Here, the bankruptcy court announced that it would apply only the business-judgment standard and "reject[] any legal standard . . . that would require [it] to consider anything other than whether rejection is consistent with [FES's] sound business judgment," meaning that it would "not consider any public interest principles potentially implicated by the Federal Power Act and/or any alleged harm that rejection could cause [FES's] contract counterparties or consumers."  The court did not give any reason or explanation for this proclamation.

On August 9 and 17, 2018, in separate orders concerning separate adversarial parties, the court accepted the counterparties' stipulations that FES had factually satisfied the ordinary business-judgment standard—i.e., that the contracts were financially burdensome to FES—whereupon the court authorized FES to reject the contracts.  The court expressly refused to reconsider the effect on the contracts of FERC's authority, the FPA, or the filed-rate doctrine, or to take the public interest into account in any way.  At the parties' request, the court designated the order as final for purposes of immediate appeal.

**II.**

This appeal presents questions of law we review de novo.  *In re Dow Corning Corp.*, 456 F.3d 668, 675 (6th Cir. 2006).  There are no disputed facts; all relevant facts were stipulated.

But, before we proceed, there are some things about this case that bear recognizing or keeping in mind.  First, this is not a liquidation, this is a debtor-in-possession restructuring.  If this were liquidation, neither FERC nor anyone else could compel the defunct debtor to keep

performing the contracts or prevent the debtor from breaching the contracts by non-performance—hence, an analogy to liquidation does not help. Similarly, an analogy to breach of contract outside of bankruptcy is also inapt inasmuch as Supreme Court caselaw, *see infra*, gives FERC authority to compel specific performance of an unprofitable or even illegal contract. As a Chapter 11 restructuring, however, FES (acting as the bankruptcy trustee) can "assume" or "reject" any executory contract, so—proceeding *arguendo* as if these are ordinary executory contracts—the question is whether and on what basis FES can reject them, or whether FERC can compel FES to assume them in Chapter 11 despite their inhibiting the viability of bankruptcy reorganization.

Second, there may be more to FES's obligations under these contracts, particularly the ICPA, than just the purchase of electricity, such as FES's proportionate contributions towards eventual facilities' decommissioning, environmental monitoring-compliance-and-cleanup, and long-term retiree benefits. If so, the bankruptcy court disregarded these aspects of the contracts when deciding that FERC's interest (and an anticipated FERC ruling to compel performance) was an overwhelmingly private benefit to the contract counterparties, and not a public interest.

Third, these are contracts for a very small quantity of electricity in relation to FES's total electricity capacity (0.75%) or the overall PJM electricity market (0.04%). Viewed in that light, the public interest in the fulfilment of these contracts might be correspondingly small. According to FES—and this is unrefuted—no consumers will suffer any electricity shortage and the counterparties will easily sell their electricity into the market at minimal or no financial loss. But the bankruptcy court's ruling is not limited to or dependent on such facts; it would apply in every case, even on facts that involve, for example, 100% of the capacity of a single-source energy distributor.

That is, suppose an energy distributor has a single (filed rate) energy-purchase contract and it is losing money, with a forecast that it will eventually go defunct. That distributor wants to cancel that contract and sign a new and better (profitable) contract with a different energy generator, leaving the old (non-competitive) generator and the unprofitable contract behind. Under the FPA, the distributor would have to convince FERC that the old contract seriously

harms the public interest—taking into account not just its own financial difficulties, but the effect on the counterparty generator, consumers and competitors, and area-wide electricity capacity and markets—so as to persuade FERC to revise (or abrogate) the old contract. That is the approach Congress intended when it enacted the FPA and put FERC in charge of the decision. But, according to this bankruptcy court, the distributor could circumvent all of that by filing Chapter 11 and rejecting the contract solely because it is uneconomical, even if that action would force the counterparty generator itself into liquidation (hypothetically leaving its other customers without electricity, and leaving the government to cover decommissioning, cleanup, pension obligations, etc.), disrupt area-wide energy markets or the otherwise-regulated competitive balance in them, or perhaps leave some consumers without electricity. That would appear to be a problem. *Cf. Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 580 (1981) ("It would surely be inconsistent with [the FPA's] congressional purpose to permit a [bankruptcy] court to do through a breach-of-contract action what [FERC] itself may not do.").

In short, there are legitimate and significant competing concerns here that require careful consideration, given that our holding must both resolve this appeal under this unique set of facts and set out a broader rule that will govern or guide future cases with different facts. The bankruptcy court did not limit its ruling to the present facts, or even acknowledge them, and it expressly refused to consider any concerns other than its own concerns about the bankruptcy.

## A.

The appellants argue that these are not ordinary "contracts." Rather, the act of filing them with FERC transforms them, meaning they are no longer "contracts" but have effectively become federal regulations. Accordingly, FES cannot "reject" them in bankruptcy because "rejection," as a concept, applies only to contracts, which these are not. Instead, to properly— legally—change its obligations under these de jure regulations (i.e., "filed contracts"), FES must persuade FERC to revise (or abrogate) them pursuant to the FPA and the controlling legal doctrines. Put another way, the appellants argue that the bankruptcy court erred and exceeded its authority by putatively permitting FES to "reject" federal regulations via bankruptcy.

The "filed-rate doctrine," as applied in the FPA, holds that FERC has plenary and exclusive jurisdiction over wholesale power rates, terms, and conditions of service for any such rate filed with FERC. *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 371-72 (1988). This is not limited to only "rates," but includes all contractual provisions, methodologies, restrictions, or any quantity or price terms. *Id.* Moreover, the filed-rate doctrine fully applies to energy contracts between private parties when those contracts are filed with and approved by FERC.

To that end, the *Mobile–Sierra* doctrine holds that the rate set out in a freely negotiated contract presumptively meets the "just and reasonable" requirement imposed by FPA statute unless FERC concludes that the result will "seriously harm the public interest." *NRG Power Mktg., LLC v. Maine Pub. Util. Comm'n*, 558 U.S. 165, 167 (2010) (quotation marks omitted); *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 530 (2008). Thus, FERC can only revise (or abrogate) a filed contract upon finding that it seriously harms the public interest.

The appellants' theory proceeds based on several cases that construe these doctrines to mean that, once "filed," these energy contracts—though they were freely and independently negotiated and entered into between private parties—effectively become de jure federal regulation (or statute), with FERC as the enforcing body. Despite acknowledging this case law, the bankruptcy court still treated the ICPA and PPAs as mere ordinary contracts, not as de jure regulations.

The Supreme Court has held that FERC may compel a party to continue to perform even a money-losing contract. *See Fed. Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348, 355 (1956) ("[I]t is clear that a contract may not be said to be either 'unjust' or 'unreasonable' simply because it is unprofitable to the public utility."). And the Court has held that FERC may compel a party to perform the terms of a filed contract even after the underlying contract itself has been nullified as illegal in violation of anti-trust laws. *See Pennsylvania Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414, 422 (1952) ("The duty [to perform] springs from the

Commission's authority, not from the law of private contracts."). Therefore, the Supreme Court has, in some circumstances, treated such filed contracts as other than ordinary contracts.

And, from this treatment, courts have opined that, once the contract is filed with FERC, "it is to be treated as though it were a statute, binding upon the seller and the purchaser alike." *Nw. Pub. Serv. Co. v. Montana-Dakota Utils. Co.*, 181 F.2d 19, 22-23 (8th Cir. 1950), *aff'd*, 341 U.S. 246 (1951) (citing, among others, *Texas & Pac. Ry. Co. v. Cisco Oil Mill*, 204 U.S. 449 (1907)). The point of *Montana-Dakota* was that the district court had no authority to decide for itself whether rates were "just and reasonable," even though the rates originated in contract, because the FPA gave that authority exclusively to the Commission (predecessor to FERC). *Id.*

In *Boston Edison Co. v. FERC*, 856 F.2d 361, 372 (1st Cir. 1988), the court quoted *Montana-Dakota* (the contract "is to be treated as though it were a statute") and explained that its intent was to promote stability between energy suppliers and customers, i.e., "to keep the litigious world outside the ratemaking environment on an even keel." And *Boston Edison* elaborated:

> We remark, too, that such a rule brings a certain symmetry to the ratemaking process. *Sierra* held that . . . a utility may agree to an unprofitable deal, and if it does, it is not entitled to be relieved of its improvident bargain. The flip side of this proposition—that purchasers can make bargains which in hindsight prove improvident—seems logically inferable. It appears consistent with *Sierra*, therefore, to permit [a supplier] to . . . profit to an 'undeserved' extent if the buyer fails seasonably to protest an overcharge. In our view, the policies enunciated by Congress are in no way demeaned by requiring primary energy distributors and their wholesale customers alike to exercise reasonable self-interested vigilance and to act promptly to protect their respective positions.

*Id.* (citations, quotation marks, editorial marks, and footnote omitted) (relying on *Sierra*, 350 U.S. at 355; *FPC v. Tenn. Gas Trans. Co.*, 371 U.S. 145, 153 (1962) (holding that a company must "shoulder the hazards" of setting its initial rate)). In a footnote to that passage, however, the *Boston Edison* court "acknowledge[d] that there may be instances where [mandating performance] might smack of unconscionability, or where some striking public necessity should be given overriding effect." *Id.* at 372 n.12 (citing *Permian Basin Area Rate*

*Cases*, 390 U.S. 747, 820-22 (1968) (holding that agreements may be abrogated in circumstances of "unequivocal public necessity")).

Finally, in *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 839 (9th Cir. 2004), and *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 488 (7th Cir. 1998), the Ninth and Seventh Circuits each stated flatly that "once filed with a federal agency, such tariffs are the equivalent of a federal regulation." The point of those opinions was that the parties' filing of the rate pursuant to federal law (here, the FPA) extinguished any state-court jurisdiction for breach of contract. *Id*.

So multiple courts have opined that filed contracts are not ordinary contracts and—in some sense—have the force of regulation or statute, at least insofar as to keep a district court or a state court from messing with them. But the question here is whether they have the force of regulation (statute) vis-à-vis the bankruptcy court, to keep the bankruptcy court from messing with them. It is not at all certain that the application or reasoning necessarily tracks, particularly where the bankruptcy court is not attempting to consider the contracts for itself (as the district court in *Montana-Dakota*) or impose competing state law (as in *Lockyer* and *Cahnmann*). The bankruptcy court here wants to treat the filed contracts as ordinary contracts so that the debtor can reject them, which it could *not* do with a regulation or statute and which would appear to be contrary to *Sierra* and *Pennsylvania Water* (holding that FERC can compel performance of money-losing contracts and illegal contracts, respectively). But it also appears that *Boston Edison* and *Permian Basin* answer this with the caveat concerning "striking" or "unequivocal" public necessity, because a party's bankruptcy would satisfy such a public necessity. Even *Sierra*, which held that "a contract may not be said to be either 'unjust' or 'unreasonable' simply because it is unprofitable to the public utility," also recognized a different outcome when "the rate is so low as to . . . impair the financial ability of the public utility to continue its service." *Sierra*, 350 U.S. at 355; *see also NRG Power*, 558 U.S. at 177 (Stevens, J., dissenting) ("Only if the rate was so low that the seller might be unable to stay in business, thereby impairing the public interest, could the seller be excused from performing its contract."). No one suggests that FES's bankruptcy claim is illegitimate.

Therefore, we hold that the public necessity of available and functional bankruptcy relief is generally superior to the necessity of FERC's having complete or exclusive authority to regulate energy contracts and markets. This means that, for present purposes, the ICPA and the PPAs are not de jure regulations but, rather, ordinary contracts susceptible to rejection in bankruptcy. This rather simple decision does not end this appeal, but it is a critically important start. Moreover, as there is clearly a public interest in both "necessities," we must further conclude that, as between them, if the bankruptcy court's jurisdiction is not *exclusive*—and, as will be explained, it is not— its position in the *concurrent* jurisdiction is nonetheless primary or superior to FERC's position.

The bankruptcy court has jurisdiction to decide whether FES, as a Chapter 11 debtor-in-possession, may reject the ICPA and PPA contracts, meaning that FES can reject the contracts subject to proper bankruptcy court approval and FERC cannot independently prevent it.

**B.**

The bankruptcy court enjoined FERC from: (1) "initiating or continuing any proceeding"; (2) "issuing any order . . . requir[ing] or coerc[ing] [FES] to continue performing [the contracts] or limiting [FES] to seeking abrogation . . . under the [FPA]"; or (3) "interfer[ing] with th[e] [bankruptcy] [c]ourt's exclusive jurisdiction." The bankruptcy court claimed two alternative bases for its authority to issue this overwhelming injunction.

**1.**

As one source of its authority, the bankruptcy court declared that Chapter 11's automatic stay provision, 11 U.S.C. § 362(a), barred any FERC proceedings related to the ICPA or PPAs as filed rates (or filed contracts), and that the "regulatory powers exception" to the automatic stay, § 362(b)(4), did not apply. The appellants contend that this was both wrong and insupportable, given the Fifth Circuit's unequivocal and unremarkable statement that "FERC is exempt from the Bankruptcy Code's automatic stay provision," *Mirant*, 378 F.3d at 523.

The filing of a Chapter 11 bankruptcy petition generally operates as an automatic stay of non-bankruptcy legal proceedings against the debtor, applicable to, among other things:

> (1) the commencement or continuation . . . of . . . [an] administrative . . . action or proceeding against the debtor that was or could have been commenced before the commencement of the [petition], or to recover a claim against the debtor that arose before the commencement of the [petition]; [and]
>
> . . .
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]

11 U.S.C. § 362(a). But, there are exceptions to this rule, one being that it does not stay:

> [T]he commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . *regulatory power*, including the enforcement of a judgment other than a money judgment, obtained in . . . [a] proceeding by the governmental unit to enforce [its] regulatory power.

§ 362(b)(4) (emphasis added). Because a "governmental unit" includes any "department, agency, or instrumentality of the United States," § 101(27), FERC is a governmental unit.

Under Sixth Circuit precedent, we apply two tests "[t]o determine whether an action qualifies as a proceeding pursuant to a governmental unit's . . . regulatory power, and therefore falls outside the ambit of the automatic stay": the pecuniary-purpose test and the public-policy test. *Chao v. Hosp. Staffing Servs.*, 270 F.3d 374, 385 (6th Cir. 2001). The pecuniary-purpose test does not apply here—and no one contends that it does—because FERC has no pecuniary interest here.

We therefore apply the public-policy test, under which "reviewing courts must distinguish between proceedings that adjudicate private rights and those that effectuate public policy. Those proceedings that effectuate a public policy are excepted from the stay." *Id.* at 385-86 (quotation marks and citations omitted). To differentiate, courts separate actions that were "instituted to effectuate the public policy goals of the governmental entity," *id.* at 386, from actions to "adjudicate private rights" or to further "private parties' interest in obtaining a pecuniary advantage over other creditors," *id.* at 389.

> [S]ome suits by governmental units, even though they would effectuate certain declared public policies, will nevertheless be regarded as largely in furtherance of private interests. *An extreme example of such would be a suit by a state attorney general on behalf of a supplier against its debtor-customer to enforce a contract obligation.* Although the suit would effectuate the state's public policy in favor of enforcing contractual obligations or requiring payment of damages, the suit essentially enforces the supplier's private rights against the debtor and would result in a pecuniary advantage to the state-favored supplier vis-a-vis other creditors of the debtor's estate.

*Id*. (emphasis added). Certainly, that example appears rather like our situation. But:

> Applying this test is a difficult undertaking, and many cases will be close . . . [so] courts should examine the type of enforcement action brought and the relationship between a particular suit and Congress's . . . declared public policy.

> When an action furthers both public and private interests and *the private interests do not significantly outweigh the public benefit* from enforcement, courts should defer to the legislature's decision to vest enforcement authority in the executive and recognize such actions as within [the exception for] 'such governmental unit's police and regulatory power,' as that term is used in § 362(b)(4).

> However, when the action *incidentally serves public interests but more substantially adjudicates private rights*, courts should regard the suit as outside the police power exception, particularly when a successful suit would result in a pecuniary advantage to certain private parties vis-a-vis other creditors of the estate, contrary to the Bankruptcy Code's priorities.

*Id.* at 389–90 (paragraph breaks inserted and emphasis added).

Here, the bankruptcy court concluded that a FERC action would fail the public-policy test because it would "be only incidentally related to the core public policy of the Federal Power Act and would be more substantially about litigating who gets what from the insolvent enterprise":

> [I]f OVEC or the PPA counterparties succeed in obtaining the relief they seek in the FERC Proceeding, the primary impact will be a pecuniary advantage to those counterparties relative to other similarly situated creditors of the estate. Seeking that result is the obvious and dominant purpose of the FERC Proceeding.

*In re FirstEnergy*, 2018 WL 2315916, at *10. But the court also recounted that:

> No party advanced arguments or evidence suggesting that the proposed Rejection Motions present any material threat to the plentiful availability of electricity in the markets where FES sells it, and the Stipulations show that in terms of both capacity available to FES and actual supply to FES, OVEC and the PPA

counterparties are only a small part of the FES portfolio, even if it were the case—which it appears not to be []—that OVEC and the PPA counterparties could not resell their capacity and supply into the market shortly, maybe nearly instantaneously, after losing FES as a buyer.

*Id.* As an apparent finding or determination of relevant facts, this is important because it certainly touches on the general public interest, but it is also peculiar, in that it suggests that FERC was *not* predominantly advancing the private benefits of the counterparties if this is correct that the counterparties did not need the contracts fulfilled and suffered no damages from a breach.[11]

Regardless, based on the particular facts of this case—i.e., the tiny (relative to the market) amounts of energy involved in these contracts, FES's small stake in the ICPA (4.85%), and the lack of damages to the PPA counterparties versus the anticipated disproportionate harm to the other creditors—the bankruptcy court was not necessarily wrong in concluding that a FERC action would only "incidentally serve public interests but more substantially adjudicate private rights," *Chao*, 270 F.3d at 390, and therefore fail the public-interest test necessary to avoid the stay. But, despite recognizing these facts, the bankruptcy court did not limit its holding (or injunction) to these facts. Rather, it appears to have held that FERC's interest in preventing bankruptcy rejection of *any* such contracts is and will always be substantially private and only incidentally public.

Brandishing *Chao*[12] like a magic wand, the bankruptcy court went much farther than necessary and enjoined FERC from doing *anything at all*. It quoted *Chao*'s statement that "[o]nce a bankruptcy proceeding begins in [bankruptcy] court, the concurrent jurisdiction of other courts is partially stripped," *id*. at 383, but left out *Chao*'s ensuing caveat that, "[a]ssuming its jurisdiction is otherwise sound, the non-bankruptcy court may enter orders not inconsistent with the terms of the stay and any orders entered by the bankruptcy court respecting the stay." *Id.* at 384.

---

[11]It bears remembering that appellant OCC is a public-interest group, not a counterparty to any contract, and would receive no private benefit whatsoever from an order by FERC for FES to continue to perform on the contracts.

[12]Note that *Chao*, 270 F.3d at 382, expressly limited itself to the "peculiar circumstances of [its] case."

The bankruptcy court enjoined FERC from doing *anything and everything*—from entering *any* orders or even holding its own hearing—by citing to *Chao*'s clarification that:

> If the non-bankruptcy court's initial jurisdictional determination is erroneous, the parties run the risk that the entire action later will be declared void *ab initio*. If a [federal agency] and the bankruptcy court reach differing conclusions as to whether the automatic stay bars maintenance of a suit in the non-bankruptcy forum, the bankruptcy forum's resolution has been held determinative. . . .

*Id*. But, again, the bankruptcy court not only ignored the "run the risk" aspect of this provision, it also omitted any recognition of *Chao*'s follow-up provision that "such a conflict would have to be resolved by an appellate court with jurisdiction to hear appeals from both fora." *Id*. This was misleading, and neither an accurate nor reasonable recitation or application of *Chao*.

Instead of allowing FERC to "run the risk" that a court of appeals might later disagree with its jurisdictional determination and render its entire proceeding void *ab initio*, the bankruptcy court enjoined FERC from conducting any proceeding at all, opining that: "If FERC were to plunge ahead based [o]n a different interpretation of Section 362(b)(4), that action would be a fool's errand because any order it might issue [out of that proceeding] . . . [would] be void *ab initio*." *FirstEnergy*, 2018 WL 2315916, at *11. While that prediction might be correct, the bankruptcy court's authority to impose this absolute injunction against any FERC activity clearly does not come from *Chao*. *Chao* would permit FERC to proceed at its own risk with any actions over which it felt it had jurisdiction, such as holding hearings and making findings, and to issue any orders that did not violate the bankruptcy stay or conflict with the bankruptcy court's orders.

Under *Chao*, once the bankruptcy court determined that the anticipated FERC action of ordering contract performance (or forbidding contract rejection) would fail the public-policy test and, therefore, not qualify as a regulatory-powers exception to the automatic stay, then it could enjoin FERC from issuing such an order. But the bankruptcy court was not entitled to enjoin FERC from risking its own jurisdictional decision, conducting its business (otherwise mandated by regulation), or issuing orders that would not conflict with the bankruptcy court's rulings.

**2.**

As the other, alternative, source of its authority for the injunction, the bankruptcy court declared that 11 U.S.C. § 105(a) gave it "the power to enjoin FERC . . . [so as] to avoid the cost and delay of unnecessary proceedings [before FERC] that would ultimately be held void." *FirstEnergy*, 2018 WL 2315916, at *11. It relied on the (limited) statement from *Mirant*, 378 F.3d at 523, that "a bankruptcy court can clearly grant injunctive relief to prohibit FERC from negating [a debtor's] rejection [of a filed contract] by requiring continued performance at the pre-rejection filed rate"; and it correspondingly rejected *Calpine*, 337 B.R. at 35, which disagreed with *Mirant* and held that the rejection of a filed contract is a collateral attack on the filed rate and thus within FERC's exclusive jurisdiction, not the jurisdiction of the bankruptcy court.

In *Mirant*, 378 F.3d at 515-17, the Chapter 11 debtor (Mirant) sought to reject a filed power-purchase contract under the business-judgment rule, but the district court[13] held that, because the Bankruptcy Code provides no exception to FERC's exclusive authority over filed rates (filed contracts), Mirant had to seek relief from FERC, so it denied Mirant's motions to reject the contract and to enjoin FERC from interfering, and dismissed the adversarial case. In reversing, the Fifth Circuit made three holdings that are relevant here. First, because rejection of the contract is a "breach," not a "modification" or "abrogation," it has only "an indirect effect upon the filed rate," and therefore would not conflict with FERC's authority. *Id.* at 518-20. The court deemed it important that Mirant was not rejecting the contract merely because "the filed rate exceeded the market rate for electricity," but rather because it did "not need the electricity purchased under the [contract] to fulfill its obligations to supply electricity." *Id.* at 520. "If, however, the debtor can fulfill its purchase obligations at a lower rate, then the debtor [] seeks relief [that is] not available in the [bankruptcy] court." *Id.* (citation, quotation marks, and editorial marks omitted). While FES satisfied this condition here (i.e., it does not need or want the electricity or the RECs), the bankruptcy court did not cite this condition. The Fifth Circuit also determined that, when enacting the Bankruptcy Code, "Congress did not intend to limit the

---

[13]The district court had withdrawn the reference from the bankruptcy court. *See* 28 U.S.C. § 157(d).

ability of utility companies to reject an executory power contract," based on congressional inclusion of several specific exceptions and the absence of any express "exception prohibiting rejection of, or providing other special treatment for, wholesale electric contracts subject to FERC jurisdiction." *Id.* at 521.

Next, the Fifth Circuit explained that a bankruptcy "court's powers under § 105(a) are not unlimited[,] as that section . . . does not permit [] courts to act as roving commissions to do equity." *Id.* at 523 (quotation marks and citation omitted). "[A] bankruptcy court can clearly grant injunctive relief to prohibit FERC from negating Mirant's rejection by requiring continued performance at the pre-rejection filed rate," but it cannot "prohibit[] FERC from taking *any* action" or enjoin "all of FERC's regulatory functions." *Id.* at 523-24. But that is exactly what the bankruptcy court did here, contrary to *Mirant*'s holding and reasoning.

Finally, the Fifth Circuit said "the business judgment standard would be inappropriate in this case because it would not account for the public interest inherent in the transmission and sale of electricity." *Id.* at 525. The bankruptcy court here dismissed this portion of the *Mirant* opinion and, instead, chose to proceed on the opposite course, refusing to consider any public interest.

In *Calpine*, 337 B.R. at 31, the Chapter 11 debtor (Calpine) sought to reject a filed power-supply contract pursuant to the business-judgment rule "because electricity prices fixed in the [contract] [we]re significantly lower than prevailing electricity prices" (but was "ready and willing to supply the same amount of [] power [] at competitive market prices"). The court held that, because "the Bankruptcy Code does not expressly limit FERC's jurisdiction, and [instead] contemplates agency action during the pendency of a reorganization," "FERC's vast authority over filed rate energy contracts" is superior to the bankruptcy court's jurisdiction. *Id.* at 35, 33. The court framed the test as "whether rejection of the [contract] . . . constitutes a collateral attack of the filed rate," and determined that "in this case" it did because Calpine's only reason for rejection was its dissatisfaction with the rates. *Id.* at 35-36. The court recognized that this holding (i.e., exclusive FERC jurisdiction) was in "obvious conflict" with *Mirant*, but explained that, "were [it] to adopt and apply *Mirant* faithfully, it would still find that FERC ha[d] exclusive

jurisdiction over [this contract]" because Calpine's rate-based reason for rejection was an attempt to "directly" affect the filed rate (and was therefore a collateral attack on it), whereas *Mirant*'s was only an "indirect effect" because Mirant did not want the energy at all; it just wanted out of the contract. *Id*. at 37-38. Even if this is dicta, it self-distinguishes these cases for our purposes, based on our facts, which are that FES does not want the energy at all, thus aligning it with *Mirant*.

Fully and properly applied, *Mirant* teaches that once the bankruptcy court determined that the anticipated FERC action would directly interfere with FES's request to reject the contracts, 11 U.S.C. § 105(a) gave it the power to enjoin FERC from issuing any such contradictory order. But § 105(a) did not give the bankruptcy court unlimited power—i.e., "to act as roving commission to do equity"—to prohibit FERC from taking *any* action whatsoever or to enjoin all of FERC's regulatory functions. The bankruptcy court here went far too far. Moreover, *Mirant*'s overall holding is integrated or holistic, meaning that its determination that the bankruptcy court's authority was superior to FERC's factored in the inclusion of public-interest considerations in the standard, discussed *infra*, as a concurrent limitation on the bankruptcy court's authority.

**3.**

On appeal, FERC argues that, when the parties file a contract, they transform it into a "filed-rate contract," which is actually a regulation over which FERC has exclusive jurisdiction, so the bankruptcy court has no jurisdiction to either reject it or enjoin FERC from compelling performance of that "regulation," regardless of bankruptcy. But as we already decided in the prior section, bankruptcy reasonably serves as an "overriding necessity" to permit such contracts to be treated as ordinary contracts. And, as explained, *Chao* permits the bankruptcy court, under some circumstances, to stay FERC from directly interfering with the bankruptcy proceedings. In fact, one purpose of the automatic stay is to "prevent[] a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts." *Chao*, 270 F.3d at 383 (quotation marks and citation omitted). Moreover, *Mirant*, 378 F.3d at 523, while otherwise limited, clearly permits a bankruptcy court to use § 105(a) to "grant injunctive

relief to prohibit FERC from negating [a debtor's] rejection [of a filed contract] by requiring continued performance at the pre-rejection filed rate."

The other appellants' principal argument starts from the basic rule that, when presented with two apparently conflicting federal statutes, such as the Bankruptcy Code and the FPA, courts must attempt to "harmonize" them. *See Traynor v. Turnage*, 485 U.S. 535, 548 (1988) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." (quotation marks and citation omitted)). This is easily done here, they say, by giving both the bankruptcy court and FERC veto power over the requested contract rejection, based on the business-judgment rule and public-interest considerations, respectively. But this "solution" ignores the respective purposes of the statutes as well as certain practical realities.

Under the FPA, Congress sought to protect energy markets and consumers (principally from monopolistic public utilities) by putting them under the governance of a commission of experts. But, in the Code, Congress sought to protect debtors by permitting liberal restructuring in bankruptcy. As a practical matter, to be effective, restructuring must also be expeditious and possibly unfair or harmful to other concerned parties, even including the general public. It would not be reasonable in all cases to permit public-interest concerns to overrule a restructuring decision, or even to wait for FERC to conduct a full hearing to identify, assess, and opine on those concerns. Even though courts generally defer to an agency's jurisdiction, based on familiarity and expertise, *see United States v. W. Pac. R.R.*, 352 U.S. 59, 64 (1956) (deferring to the agency's primary jurisdiction to ensure needed uniformity in an area or when the agency has "special competence" over the issue), the FERC commissioners are not the only people capable of considering public-interest issues; to be sure, FERC's decisions are reviewed by appellate judges. And bankruptcy judges are capable of comprehending public interests, particularly when FERC has provided an opinion. Suffice it to say that giving veto power to both the bankruptcy court and FERC is not the only way—or necessarily the most reasonable way—to harmonize the two statutes.

On the other side, FES contends that the way to harmonize the two statutes is to pretend that the bankruptcy court's exclusive (and unlimited) jurisdiction over the "rejection" of contracts in bankruptcy does not impinge in any way on FERC's jurisdiction, which applies only to "modification" or "abrogation" of contracts, not to "rejection." But, even if we assume that rejection and abrogation are necessarily different in all cases, which is not certain, the act of giving one side complete and exclusive authority over the other does not meet any definition of "harmonize."

On the whole, we conclude that the way to "harmonize" these two statutes is by holding that the bankruptcy court may, based on the particular facts and circumstances before it, enjoin FERC from issuing an order (or compelling an action) that would directly conflict with the bankruptcy court's orders or interfere with its otherwise-authorized authority, but the bankruptcy court may not enjoin FERC from risking its own jurisdictional decision, conducting its (otherwise regulatory mandated) business, or issuing orders that do not interfere with the bankruptcy court.

Here, the bankruptcy court had the limited authority (jurisdiction) to enjoin FERC from "issuing any order . . . [that would] require or coerce [FES] to continue performing [the contracts] or limit[] [FES] to seeking abrogation . . . under the [FPA]." But the bankruptcy court exceeded its authority by enjoining FERC from "initiating or continuing any proceeding" or "interfer[ing] with [its] exclusive jurisdiction," particularly because the bankruptcy court did not have exclusive jurisdiction. These latter two parts to the injunction, having been issued without jurisdiction to support them, were improper and are void. Moreover, through this rash and unnecessary overreach, the bankruptcy court has prevented FERC from timely completing an investigation into or holding a hearing about the public interest in the proposed rejection of these contracts, which—as will be discussed *infra*—would have been appropriate and might have been valuable or beneficial to the ultimate determination.

## C.

Despite the appellants' repeated requests, the bankruptcy court applied only the business-judgment standard and "rejected any legal standard . . . that would require [it] to consider

anything other than whether rejection is consistent with [FES's] sound business judgment"; meaning that it refused to "consider any public interest principles potentially implicated by the Federal Power Act and/or any alleged harm that rejection could cause [FES's] contract counterparties or consumers." The appellants argue that this was reversible error.

In *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 518 (1984), the Chapter 11 debtor (Bildisco) sought to reject a collective-bargaining agreement (CBA) under the business-judgment rule. The Court determined that the Code provision on rejection of executory contracts did not specifically exclude this CBA, so it was subject to rejection, *id*. at 521-22, but "because of the special nature of a collective-bargaining contract, . . . a somewhat stricter standard [than the ordinary business-judgment rule] should govern the decision of the Bankruptcy Court to allow rejection of a collective-bargaining agreement," *id*. at 524. Specifically, "the Bankruptcy Court should permit rejection of a [CBA] under § 365(a) [] if the debtor can show that the [CBA] burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting [it]." *Id*. at 526.

> The *Mirant* opinion applied this *Bildisco* approach to rejection of filed contracts:
>
> The nature of a contract for the interstate sale of electricity at wholesale is also unique. . . . Use of the business judgment standard would be inappropriate . . . because it would not account for the public interest inherent in the transmission and sale of electricity. Therefore, upon remand, the district court should consider applying a more rigorous standard to the rejection of the [contract].
>
> [The bankruptcy court] might adopt a standard by which it would authorize rejection of an executory power contract only if the debtor can show [1] that it burdens the estate, [2] *that, after careful scrutiny, the equities balance in favor of rejecting that power contract*, and [3] that rejection of the contract would further the Chapter 11 goal of permitting the successful rehabilitation of debtors.
>
> When considering these issues, the court[] should *carefully scrutinize the impact of rejection upon the public interest and should,* inter alia*, ensure that rejection does not cause any disruption in the supply of electricity to other public utilities or to consumers*. The bankruptcy court has already indicated that it would include FERC as a party in interest for all purposes in this case under 11 U.S.C. § 1109(b) and Fed. R. Bankr. P. 2018. . . . Therefore, *FERC will be able to assist the court in balancing these equities*.

*Mirant*, 378 F.3d at 525-56 (citations, quotation marks, editorial marks, and footnote omitted; paragraph break removed and different paragraph breaks inserted; emphasis added).

For example, under one argument, OCC says the bankruptcy court improperly ignored its claim that rejection of the ICPA contract would improperly shift FES's obligations to the other participants, increase costs to Ohio consumers (who are subject to compulsory rate riders), and theoretically disrupt the entire electricity market.[14] While this has not been contested, analyzed, or decided, it appears speculative, and the facts here actually appear to present a rather limited public impact from FES's rejection of the contracts. But other cases on different facts could create a significant public impact.[15] In a different case, it could be in the public interest to compel a Chapter 11 debtor to assume a financially burdensome contract as part of its restructuring. And it is not impossible that, even if such a contract is so overwhelming that the debtor cannot assume it and remain solvent, that FERC or a bankruptcy court could conclude that liquidation might better serve a serious public interest by allowing market competition or adjustment by others.

We conclude that an adjusted standard best accommodates the concurrent jurisdiction between, and separate interests of, the Bankruptcy Code (court) and the FPA (FERC). On remand, the bankruptcy court must reconsider its decision under this higher standard, considering and deciding the impact of the rejection of these contracts on the public interest—including the consequential impact on consumers and any tangential contract provisions concerning such things as decommissioning, environmental management, and future pension obligations[16]—to ensure that the "equities balance in favor of rejecting the contracts," *Mirant*, 378 F.3d at 525.

---

[14]In its appellate brief, Duke makes much of the fact that the ICPA is a "unique multi-utility composition . . . and cost allocation structure," that "simply does not contemplate that any of the [participants] could be relieved of its obligation[s]." That, however, does not necessarily present a "public" interest.

[15]Maryland Solar argues that, under *Mirant*, the "equities balance" against the rejection because of the "substantial burden that would be imposed on Maryland Solar as a result of the termination of its exclusive supply agreement with FES." This mistakes Maryland Solar's private interest (in the benefit from its contract) with the public interest and is not, under *Mirant* or the analysis herein, a compelling reason.

[16]Several appellants cite the recent decision in *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019), for the proposition that the rejection of a contract does not necessarily relieve a debtor from related obligations. In that case, the debtor (Tempnology) sought to reject an executory contract that gave Mission the

While we anticipate that a bankruptcy court would ordinarily provide FERC with the opportunity to provide an opinion on the public interest, *see id.* at 526 (presuming that the bankruptcy court would "welcome FERC's participation" or even "include FERC as a party in interest"), we recognize that a bankruptcy court need only provide FERC with a *reasonable* accommodation or suffer a *reasonable* delay in providing such opportunity. Reasonableness is relative, however, and in this case, it bears recognizing that FERC would likely have already completed an opinion on the public interest if not for (at FES's behest) the bankruptcy court's improper and absolute injunction preventing FERC from conducting its assessment. Therefore, a "reasonable" delay in this remand may be much longer than it would be in an ordinary case. We also recognize that, even given an invitation, FERC is not necessarily compelled to participate.

To recap, when a Chapter 11 debtor moves the bankruptcy court for permission to reject a filed energy contract that is otherwise governed by FERC, via the FPA, the bankruptcy court must consider the public interest and ensure that the equities balance in favor of rejecting the contract, and it must invite FERC to participate and provide an opinion in accordance with the ordinary FPA approach (e.g., under the *Mobile–Sierra* doctrine), within a reasonable time

**III.**

For the foregoing reasons, we AFFIRM in part and REVERSE in part the judgment of the bankruptcy court and REMAND for further consideration consistent with this opinion.

---

exclusive distribution of Tempnology's products and, as a separate provision, permitted Mission to use its trademarks. *Id.* at 1658. The Court ruled that while the rejection allowed Tempnology to stop performing on the contract (i.e., to stop the exclusive distribution, subject to breach-of-contract damages), it did not rescind Mission's rights to use the trademarks that Tempnology had granted it under the contract.

> Section 365 provides a debtor like Tempnology with a powerful tool: Through rejection, the debtor can escape all of its future contract obligations, without having to pay much of anything in return. But in allowing rejection of those contractual duties, Section 365 does not grant the debtor an exemption from all the burdens that generally applicable law—whether involving contracts or trademarks—imposes on property owners.

*Id.* at 1665-66 (citation omitted). It is not certain that *Tempnology* is entirely analogous with the present case, but this is certainly an aspect that the parties may argue on remand.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

GRIFFIN, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority that the bankruptcy court erred by using the business-judgment standard in evaluating the motions to reject the power purchase agreements at issue here. I also agree that the bankruptcy court's injunction was overbroad in that it "enjoined FERC from doing *anything and everything*." However, the bankruptcy court also erred by enjoining FERC from "issuing any order, to require or coerce [FES] to continue performing . . . or limiting [FES] to seeking abrogation . . . under the Federal Power Act." Here, the bankruptcy court exceeded its jurisdiction and infringed on FERC's exclusive jurisdiction to decide whether to modify or abrogate a filed rate.

The majority opinion upholds this part of the bankruptcy court's injunction based on a flawed understanding of how filed rates operate under the FPA. Supreme Court precedent makes clear that FERC enforces a power company's obligations under a filed rate pursuant to statutory authority, not private contract law. Thus, a filed rate is an independent legal obligation separate from a contract for the sale of power. The majority, however, brushes this precedent aside and conflates the filed rate with the private contract. Proceeding from this faulty premise, the majority opinion declares that the bankruptcy court had the power to abrogate FES's obligations under both the private contract and the filed rate—and to enjoin FERC from compelling FES to perform its regulatory filed-rate obligations. This holding conflicts with Congress's decision to deny federal-court jurisdiction over the abrogation or modification of a filed rate. Thus, for the reasons more fully explained below, I respectfully concur in part and dissent in part.

I.

At the outset, a review of the FPA and FERC's authority is helpful.

A.

"The [FPA] long has been recognized as a comprehensive scheme of federal regulation of all wholesales of [energy] in interstate commerce." *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 475 (4th Cir. 2014) (alterations in original) (quoting *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988)), *aff'd sub nom. Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016). The FPA authorizes FERC to "regulate 'the sale of electric energy at wholesale in interstate commerce,' including both wholesale electricity rates and any rule or practice 'affecting' such rates." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 766 (2016) (quoting 16 U.S.C. §§ 824(b), 824e(a)), *as revised* (Jan. 28, 2016). The Supreme Court has adopted "a common-sense construction of the FPA's language, limiting FERC's 'affecting' jurisdiction to rules or practices that *directly* affect the wholesale rate." *Id.* at 774 (internal quotation marks and citations omitted). Acting within its jurisdiction, FERC has the "power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions" of the FPA. 16 U.S.C. § 825h; *cf.* 11 U.S.C. § 105(a).

"[E]very public utility" is required to file with FERC proposed "schedules showing all rates and charges for any transmission or sale" of power "and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services." 16 U.S.C. § 824d(c). FERC must then determine whether the filed rates are "just and reasonable, and any such rate or charge that is not just and reasonable is . . . unlawful." § 824d(a). No one may change the filed rate or engage in commerce at anything other than the filed rate without first making a filing with FERC. §§ 824d(a), (e), 824e(a); *see Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) (citation omitted). This is known as the "filed rate doctrine."

The Supreme Court has repeatedly stated that FERC has "exclusive jurisdiction over wholesale sales of electricity in the interstate market." *Hughes*, 136 S. Ct. at 1291; *see Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 371 (1988); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 956 (1986). And that "exclusive jurisdiction applies not

*In re: FirstEnergy Solutions Corp.*

only to rates but also to power allocations that affect wholesale rates." *Miss. Power*, 487 U.S. at 371. This means that "[t]he reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts. The only appropriate forum for such a challenge is before the Commission or a court reviewing the Commission's order." *Id.* at 375. The Court has enforced this jurisdiction strip several times, rebuffing various attempts by the states to "invade[ ] FERC's regulatory turf." *Hughes*, 136 S. Ct. at 1297 (citation omitted); *see Miss. Power*, 487 U.S. at 377; *Nantahala*, 476 U.S. at 966.

B.

Once filed with FERC, a "filed rate" becomes an obligation external to the contract, with the independent force of law. On this issue, the Supreme Court's decision in *Penn Water* is instructive. *Penn. Water & Power Co. v. FPC*, 343 U.S. 414 (1952). In that case, the Federal Power Commission (FERC's predecessor agency) "asserted jurisdiction over the rates charged by a licensee to a Maryland distributor of electric power." *FPC v. S. Cal. Edison Co.*, 376 U.S. 205, 218 (1964). "Penn Water contend[ed] that the Commission's orders improperly require[d] it to continue performing" on a contract the Fourth Circuit had previously invalidated under antitrust laws. *Penn. Water*, 343 U.S. at 421; *see Penn. Water & Power Co. v. Consol. Gas, Elec. Light & Power Co.*, 184 F.2d 552 (4th Cir. 1950). In affirming the Commission's exercise of jurisdiction, the Court observed that pursuant to the Commission's orders, "[i]t is true that Penn Water must continue to do some of the things it used to do in compliance with the Penn Water-Consolidated contract," like "buy, sell, and transmit power in the same coordinated manner in which it [had] been functioning for more than twenty years." *Penn. Water*, 343 U.S. at 421. But the Commission's orders "neither expressly nor impliedly require[d] Penn Water to yield to any contractual terms subjecting it to the control of Consolidated." *Id.* In fact, the Court noted that it "need not now decide . . . what, if any, power the Commission has to rely on or to compel parties to carry out private contracts which would otherwise be illegal" because "the Commission has not attempted to exercise such power in this case." *Id.* Instead,

> [t]o the extent that Penn Water is being controlled, it is by the Commission, acting under statutory authority, not by Consolidated, acting under the authority of private contract terms 'legalized' by the Commission. The duty of Penn Water to

continue its coordinated operations with Consolidated springs from the Commission's authority, *not from the law of private contracts*.

*Id.* at 422 (emphasis added).

The Court then explained that the FPA "gives the Commission ample statutory power to order Penn Water and Consolidated to continue their long-existing operational 'practice' of integrating their power output," *id.*, including the mandate to "determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and . . . fix the same by order," 16 U.S.C. § 824e(a). "In ordering such 'practice' continued, the Commission was furthering the expressly declared policy of the Act." *Penn. Water*, 343 U.S. at 422–23.

A few years after *Penn Water*, the Court similarly held that the Commission's power to compel performance by regulated entities under the Natural Gas Act is not limited to the terms of a contract for the sale of natural gas. *Sunray Mid-Con. Oil Co. v. FPC*, 364 U.S. 137, 155 (1960) ("The obligation that petitioner will be under after the contract term will not be one imposed by contract but by the Act."). And in *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332 (1956), the Court "recognized that there were two sources of price and supply stability inherent in the regulatory system established by the Natural Gas Act—the provisions of private contracts and the public regulatory power." *Sunray*, 364 U.S. at 155 (citing *Mobile*, 350 U.S. at 344). These decisions are relevant here because the Court has a longstanding and "established practice of citing interchangeably decisions interpreting the pertinent sections of the" FPA and the Natural Gas Act. *Arkla*, 453 U.S. at 577 n.7 (citations omitted); *see FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 349–53 (1956).

Thus, the Supreme Court has made clear that when FERC enforces a regulated entity's obligations under a filed rate, it acts "under statutory authority" and not "under the authority of private contract terms 'legalized' by the Commission." *Penn. Water*, 343 U.S. at 422. Relying on these cases, FERC has held this position for quite some time. *See Blumenthal v. NRG Power Mktg.*, Inc., 104 FERC ¶ 61211, ¶ 61743 (FERC 2003) ("[T]he Commission exercised . . . its authority under the FPA, which is independent of authority arising from the contract, to prevent

such a stoppage of wholesale service that might be inconsistent with the public interest." (footnote omitted)); *see also Am. Elec. Power Serv. Corp.*, 106 FERC ¶ 61,020, ¶ 61,049 (FERC 2004) ("The argument that we have authority to set just and reasonable rates, terms and conditions but not enforce the tariffs is unpersuasive. Indeed, the FPA and the Commission's authority under Sections 205 and 206 (and 309) of the FPA would be virtually meaningless if we had no authority to enforce the tariffs that the statute requires must be filed with and reviewed by us." (footnote omitted)).

In addition, the First and Eighth Circuits have stated that once a rate has been filed with FERC, it "is to be treated as though it were a statute." *Nw. Pub. Serv. Co. v. Montana-Dakota Utils. Co.*, 181 F.2d 19, 22 (8th Cir. 1950) (citing *Pa. R.R. Co. v. Int'l Coal Mining Co.*, 230 U.S. 184, 197 (1913)) (additional citation omitted), *aff'd*, 341 U.S. 246 (1951); *see Bos. Edison Co. v. FERC*, 856 F.2d 361, 372 (1st Cir. 1988) (same). The Seventh and Ninth Circuits have similarly noted that "[a] tariff filed with a federal agency is the equivalent of a federal regulation." *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 488 (7th Cir. 1998) (citations omitted); *see California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 839 (9th Cir. 2004) (same), *opinion amended on denial of reh'g*, 387 F.3d 966. And several circuits have acknowledged this principle in other areas in which the filed rate doctrine has force. *See, e.g.*, *Evanns v. AT&T Corp.*, 229 F.3d 837, 840 n.9 (9th Cir. 2000) ("Under this doctrine, once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer." (quoting *Marcus v. AT&T Corp.*, 138 F.3d 46, 56 (2d Cir. 1998))); *Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 552 (2d Cir. 1996) ("[F]ederal tariffs have the force of law and are not simply contractual."); *MCI Telecomm. Corp. v. Garden State Inv. Corp.*, 981 F.2d 385, 387 (8th Cir. 1992) ("[F]ederal tariffs are the law, not mere contracts."); *Carter v. Am. Tel. & Tel. Co.*, 365 F.2d 486, 496 (5th Cir. 1966) ("[A] tariff, required by law to be filed, is not a mere contract. It is the law.").

C.

Because filed rates and power contracts are separate obligations with independent sources of power authorizing their enforcement, answering the question of whether the bankruptcy court exceeded its jurisdiction here should be fairly straightforward. A decision of whether to grant the rejection of the power purchase contracts lies solely with the bankruptcy court, while the decision of whether to abrogate or modify the filed rates lies solely with FERC. "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate . . . ." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (citation omitted). But it did not authorize bankruptcy courts to "invade[ ] FERC's regulatory turf" by modifying or abrogating filed rates in its place. *Hughes*, 136 S. Ct. at 1297. A filed rate imposes public-law obligations, like a federal regulation does, and a bankruptcy court "could no more reject an actual regulation than it could reject the Constitution." *FERC v. FirstEnergy Sols. Corp. (In re FirstEnergy Sols. Corp.)*, No. 18-50757, 2018 WL 2315916, at *15. So the bankruptcy court here did not have jurisdiction (under either § 362 or § 105 of the Bankruptcy Code) to enjoin FERC from initiating proceedings or considering whether to modify or abrogate the filed rates—just as FERC would have no authority under the FPA to enjoin the bankruptcy court from rejecting executory contracts. *See* 28 U.S.C. § 1334(e) (granting "exclusive jurisdiction" to a federal court handling a bankruptcy case "of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate"). By the same token, FERC lacks jurisdiction to compel FES to perform based on private contractual duties—and the bankruptcy court lacks jurisdiction to compel FES to perform its obligations that stem from the filed rates.

These jurisdictional limitations set forth a clear path for a Chapter 11 debtor in possession such as FES that seeks relief from its obligations under a power purchase agreement and a filed rate. First, the debtor should file a motion in the bankruptcy court to reject the executory contract. The only difference is the heightened standard the bankruptcy court must use in evaluating the rejection motion. Second, the debtor in possession should petition FERC for relief

from its filed-rate obligations, a process that operates the same way inside and outside of bankruptcy.[1]

## II.

The majority opinion avoids this conclusion by veering off the trail at the first step. In this regard, it conflates the filed rate and the private contract, treating them as one and the same. Throughout its opinion, the majority refers to this conglomerate as the "filed-rate contract." However, the Supreme Court has never used this inaccurate terminology, instead taking care to separate the two. *See, e.g.*, *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 534 (2008) (referring to filed rates based on private agreements as "contract rates"—as opposed to "tariff rates"—and referring to the agreements themselves as "contracts").

## A.

The majority opinion proceeds on its path despite acknowledging *Penn Water* and lower-court precedent confirming that filed rates impose public-law obligations rather than private, contractual ones. It also acknowledges that the bankruptcy court's approach of "treat[ing] the filed-rate contracts as ordinary contracts so that the debtor can reject them, which it could *not* do with a regulation or statute . . . would appear to be contrary to *Sierra* and *Penn. Water*." From this point, however, it takes a puzzling turn. It attempts to distinguish these cases by emphasizing that they involved state courts or federal district courts interfering with filed rates rather than a bankruptcy court and by stating that in this case, "the bankruptcy court is not attempting to consider the contracts for itself . . . or impose competing state law."[2]

---

[1]The standard FERC uses to evaluate such a petition depends on the language of the power contract originally filed with FERC. *See Morgan Stanley*, 554 U.S. at 534–35.

[2]The bankruptcy court got it wrong for different reasons. First, it overlooked *Penn Water* entirely. Second, it assumed that FERC had to engage in notice-and-comment rulemaking in order to give a filed rate the force of a federal regulation. *FirstEnergy*, 2018 WL 2315916, at *15. But FERC derives its authority to enforce a power company's filed-rate obligations from the FPA, not the Administrative Procedure Act (which was enacted over ten years after the FPA). And the FPA imposes no similar notice-and-comment requirements.

Neither distinction provided by the majority opinion supports treating a filed rate as imposing public-law obligations in some circumstances and as nothing more than a private contract in others. A filed rate either has the independent force of law or it doesn't—and the Supreme Court has told us in no uncertain terms that it does. It would be nonsensical to say that a statute ceases to be a statute because a bankruptcy court interferes with its enforcement instead of a district court. Nor is it persuasive to say that a statute has any less force because a bankruptcy court "is not attempting to consider [it] for itself." Here, the bankruptcy court—just like the district court in *Montana-Dakota*—"had no authority to decide for itself whether rates were 'just and reasonable.'"

Furthermore, the majority opinion's attempt to distinguish the district courts and bankruptcy courts in this regard is unreasonable. After all, district courts have jurisdiction over bankruptcy cases and "all bankruptcy cases are referred to the bankruptcy court for disposition." *NLT Comput. Servs. Corp. v. Capital Comput. Sys., Inc.*, 755 F.2d 1253, 1256 (6th Cir. 1985). "[T]he district courts retain the power to withdraw the reference at any time." *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 199 (3d Cir. 1999) (citing 28 U.S.C. § 157(d)). The majority even cites a case where this occurred. Bankruptcy courts are less powerful than district courts, not more so, and they certainly do not have any special authority to invade a federal agency's exclusive jurisdiction—or enjoin a federal agency from carrying out its statutory mandate—that district courts do not enjoy.

It is a basic principle that a filed rate can exist without a contract. In addition to private contracting, the FPA authorizes an older rate-setting method (modeled on the Interstate Commerce Act) that "requires regulated utilities to file compilations of their rate schedules, or 'tariffs,' with the Commission, and to provide service to electricity purchasers on the terms and prices there set forth." *Morgan Stanley*, 554 U.S. at 531 (citing 16 U.S.C. § 824d(c)). Tariff-based filed rates are, for the most part, treated the same as contract-based filed rates, and a

federal bankruptcy court certainly does not have jurisdiction to extinguish obligations stemming from a filed rate that does not have a private-contract counterpart.**3**

What the majority opinion eventually concludes is that bankruptcy *law* is special or different. That is, "the public necessity of available and functional bankruptcy relief" is so important that it justifies a bankruptcy court invading FERC's "exclusive jurisdiction over wholesale sales of electricity in the interstate market," *Hughes*, 136 S. Ct. at 1289, and allows it to sit in judgment of the "[t]he reasonableness of rates and agreements regulated by FERC"— which, again, "may not be collaterally attacked in state or federal courts," *Miss. Power*, 487 U.S. at 375. The majority opinion then attempts to find support for this conclusion in FPA precedent.

It does not succeed. It rejects *Penn Water* and other contrary precedent because "it . . . appears that *Boston Edison* and *Permian Basin* answer th[em] with the caveat concerning 'striking' or 'unequivocal' public necessity, because a party's bankruptcy would satisfy such a public necessity." But neither *Boston Edison* nor *Permian Basin* makes any mention of bankruptcy whatsoever. And the language the majority opinion takes from *Permian Basin* as a hint that bankruptcy courts can step into FERC's shoes in contravention of the FPA is merely a restatement of the *Mobile-Sierra* standard that FERC uses to evaluate whether a filed rate is just and reasonable—a decision that lies within FERC's exclusive jurisdiction. The Supreme Court made this clear in *NRG Power Marketing, LLC v. Maine Public Utilities Commission*, 558 U.S. 165 (2010), by quoting *Sierra*'s core holding and then immediately afterward characterizing "the unequivocal public necessity" language from *Permian Basin* as another way the Court has "similarly explained" that standard, *id.* at 173. *See Permian Basin Area Rate Cases*, 390 U.S. 747, 822 (1968). Contextualizing this language shows that the majority has fashioned its extraordinary exception to the FPA's jurisdictional limitations out of whole cloth.

But the majority opinion does not stop there. It then declares without analysis that any bankruptcy would automatically satisfy a "public necessity" exception to FERC's exclusive jurisdiction. Dubious as this conclusory statement may be, the more important point is that the

---

**3**As a practical matter, parties tend to enter into power contracts even where the rate setting is done by tariff rather than by contract. What's important here is that nothing in the FPA requires them to do so.

"public necessity" decision is not ours to make in the first instance, nor is it the bankruptcy court's. Rather, the FPA makes clear that it is the authority of the FERC, and FERC alone, to determine whether a filed rate may be modified or abrogated on public-necessity grounds. In fact, FERC may determine, in specific cases before it, that bankruptcy provides a compelling reason to relieve a power company of its filed-rate obligations. *See Cal. Dep't of Water Res. v. Calpine Corp. (In re Calpine Corp.)*, 337 B.R. 27, 33 (S.D.N.Y. 2006) ("FERC, in its charge to maintain reasonable rates and uphold the public interest, must also consider the financial ability of a utility to continue service under a filed rate, a responsibility that would include similar considerations to those in the bankruptcy court." (citing *Sierra*, 350 U.S. at 355)). We may review FERC's decision if appealed, of course, but here the bankruptcy court enjoined FERC from making a decision at all.[4]

B.

*Mirant Corp. v. Potomac Electric Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 523 (5th Cir. 2004), does not provide a fix for the majority's flawed analysis. In that case, the Fifth Circuit held that a bankruptcy court's rejection of a power purchase contract that had been filed with FERC did not infringe on FERC's exclusive jurisdiction because such a rejection "would only have an indirect effect upon the filed rate." *Id.* at 519–20.

> When an executory contract is rejected in bankruptcy, the non-breaching party receives an unsecured claim against the bankruptcy estate for an amount equal to its damages from the breach. *See* 11 U.S.C. §§ 365(g)(1), 502(g). If Mirant's rejection of the Back–to–Back Agreement was approved, then PEPCO's unsecured claim against the bankruptcy estate would be based upon the amount of

---

[4]It is also worth noting that "the *Mobile-Sierra* presumption [is] the default rule," not the only rule, for FERC to use in its decision of whether to abrogate or modify a filed rate. *Morgan Stanley*, 554 U.S. at 534. The Supreme Court held decades ago "that parties could contract out of the *Mobile-Sierra* presumption by specifying in their contracts that a new rate filed with the Commission would supersede the contract rate." *Id.* (citing *United Gas Pipe Line Co. v. Memphis Light, Gas and Water Div.*, 358 U.S. 103, 110–113 (1958)). Since then, "Courts of Appeals have held that contracting parties may also agree to a middle option between *Mobile-Sierra* and *Memphis Light*: A contract that does not allow the seller to supersede the contract rate by filing a new rate may nonetheless permit the Commission to set aside the contract rate if it results in an unfair rate of return, not just if it violates the public interest." *Id.* Thus, the concern expressed by several litigants in this case over *Mobile-Sierra*'s high hurdle potentially frustrating a power company's bankruptcy is a matter of contract drafting, not public policy. The parties to the ICPA were free to contract in or out of the *Mobile-Sierra* presumption before they filed the agreement with FERC; they chose the default rule by not addressing the issue explicitly.

electricity it would have otherwise sold to Mirant under that agreement at the filed
rate.  Thus, the damages calculation from the rejection of a contract is . . . based
upon the filed rate.

*Id.* at 520 (citation omitted).  The court determined that the filed rate's downstream effect on the
damages calculation meant that the filed rate was not being abrogated or modified by the
bankruptcy court.  *Id.* at 519.

*Mirant* fails to persuade for two reasons.  First, like the majority here, the Fifth Circuit
conflated the private contract and the filed rate.  When the two are properly viewed as separate
things, a bankruptcy court's rejection of a private executory contract does not infringe on
FERC's exclusive jurisdiction at all because it has no effect—direct or indirect—on a filed rate
or the obligations that stem from it.  The court also failed to acknowledge any awareness of *Penn
Water* or its progeny articulating that filed rates impose public-law obligations.

Second, the Fifth Circuit adopted an unreasonably narrow view of the powers granted to
FERC by the FPA.  "FERC's jurisdiction and the filed rate doctrine stretches past regulation of
rates, 16 U.S.C. § 824d(c), and extends to the terms and conditions of wholesale energy
contracts."  *Calpine Corp.*, 337 B.R. at 32 (collecting Supreme Court cases).  And, as discussed
above, FERC has broad authority "to perform any and all acts, and to prescribe, issue, make,
amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to
carry out the provisions" of the FPA.  § 825h.  Thus, the concept of a filed rate includes much
more than merely the price of power, and FERC's authority to enforce filed-rate obligations
extends much further than setting that price.  The only other federal court to consider this issue
(besides us here) disagreed with *Mirant* for this reason.  *See Calpine Corp.*, 337 B.R. at 38; *see
also NRG Power Mktg., Inc. v. Blumental (In re NRG Energy, Inc.)*, No. 03 CIV.3754 RCC,
2003 WL 21507685, at *3 (S.D.N.Y. June 30, 2003).

C.

Here, the majority opinion explicitly rules that "the bankruptcy court's jurisdiction is . . .
primary or superior to FERC's position."  This holding ignores our duty to "harmonize" the
Bankruptcy Code and the FPA as two coequal acts of Congress.  *Traynor v. Turnage*, 485 U.S.

535, 548 (1988). We "are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). And where, as here, the two statutes at issue "have separate scopes and purposes," they should be "implemented in full at the same time," if possible. *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 118 (2014). Section I.C. above describes a clear path to harmonizing the FPA and the Bankruptcy Code under the circumstances that this case presents. Instead of using that approach—despite the fact that it follows clear Supreme Court precedent—the majority decides that bankruptcy law is more important than the Federal Power Act. Its approach is no less lopsided than authorizing FERC to consider a motion to reject a private contract and enjoin a bankruptcy court from holding hearings or entertaining such a motion itself.

What's more, the Supreme Court recently reminded us that bankruptcy is not as special or different as the majority insists. "The [Bankruptcy] Code of course aims to make reorganizations possible. But it does not permit anything and everything that might advance that goal." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1665 (2019) (citation omitted). Addressing rejection of executory contracts specifically, the Court stated that "Section 365 does not grant the debtor an exemption from all the burdens that generally applicable law . . . imposes." *Id.* (citation omitted). Thus, the Bankruptcy Code does not authorize a debtor to violate its obligations under the FPA or a filed rate any more than the criminal code or securities laws. A debtor might emerge from bankruptcy more quickly and successfully if he or she were allowed to engage in insider trading or armed bank robbery, but the "generally applicable laws" proscribing such conduct have the same force inside of bankruptcy as outside of it.[5]

---

[5]Nor is it unusual for a business to have to abide by multiple regulatory schemes in ways that can be inconvenient. Consider this example from the trucking industry. The Federal Motor Carrier Act limits the number of hours over-the-road truck drivers may drive or otherwise be on duty during specific periods—which has the effect of limiting their by-the-mile pay. But the Fair Labor Standards Act requires trucking companies to pay their drivers at least minimum wage, as measured on a per-hour basis. These two separate statutory frameworks put trucking companies in the difficult position of having to compensate drivers under a different pay scheme than the industry uses, while also preventing drivers from working past a strictly controlled time limit (making it more likely that they run into minimum-wage issues). But courts do not relieve the companies of either obligation simply because of this uncomfortable position. They regard each as effective and require compliance with both statutes. The same

As a practical matter, the majority's approach undercuts FERC's decision-making power over filed rates almost entirely, as its only recourse would be to go to the bankruptcy court on bended knee and ask it to modify or abrogate the "filed-rate contract" that the majority describes. This has the potential to upend the statutory scheme carefully set up by Congress in the FPA, as a power company could not dream of such insulation from FERC's regulation in any other scenario. *See Calpine Corp.*, 337 B.R. at 33 ("A solvent company could not choose to stop performance and expect anything other than swift FERC action."). While "[n]o one suggests that FES's bankruptcy claim is illegitimate" in this case under the majority's approach, power companies could use bankruptcy to evade regulation in an industry for which Congress envisioned close, watchful oversight. Chapter 11 provides a shield against an insolvent company's creditors, not its regulators.

## III.

Starting with the erroneous assumption that a filed rate and a private power purchase agreement are one and the same, the majority creates a conflict between the FPA and the Bankruptcy Code where none exists, and then resolves that conflict by declaring the latter to be the more important statutory scheme. This court should not be in the business of making such value judgments—and we need not do so here. We should instead follow the Supreme Court's precedent and its clear instructions. For these reasons, I respectfully concur in part and dissent in part.

---

approach should apply here, where FES chose to subject itself to FERC's jurisdiction (by entering into power contracts and then filing them with FERC) and the bankruptcy court's jurisdiction (by filing for Chapter 11 bankruptcy).